## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **EP-25-CV-542** |
| | § | |
| **MARGARET IKE and DEL NORTE** | § | |
| **HOMECARE LLC, also known as Del** | § | |
| **Norte Home Care LLC, doing business as** | § | |
| **Guardian Angel Home Health,** | § | |
| | § | |
| **Defendants.** | § | |

## <u>COMPLAINT</u>

Plaintiff United States of America (the "United States" or "Government"), by and through the United States Attorney for the Western District of Texas, alleges as follows:

### INTRODUCTION

1.      The United States brings this action to recover treble damages, civil penalties, and costs from Defendants Margaret Ike ("Ike") and Del Norte Homecare LLC, which is also known as Del Norte Home Care LLC and does business as Guardian Angel Home Health ("GAHH"), under the False Claims Act, 31 U.S.C. §§ 3729 *et seq*.

2.      In the alternative, the United States seeks to recover from Defendants under the common law theories of unjust enrichment and payment by mistake.

3.      Defendants provide home health services to Medicare beneficiaries. Home health services are medical services provided to patients in their own homes as an alternative to hospitalization or a stay at a skilled nursing facility.

4.      Under the Medicare program, covered home health services include medically necessary part-time or intermittent skilled nursing care; physical therapy, occupational therapy

where there is a continuing need, and speech-language pathology services; medical social services; part-time or intermittent home health aide care; and medical supplies for use at home.

5.    To receive home health services, a Medicare beneficiary must be "homebound," meaning the patient has trouble leaving home without help or leaving home is not recommended because the patient's condition could worsen and the patient is normally unable to leave his or her home because it is too difficult to do so.

6.    A health care provider must conduct a face-to-face assessment before certifying that a Medicare beneficiary needs home health services. The provider must document the encounter either on the certification signed by the provider or on a separate signed addendum to the certification. The documentation must include the date on which the provider saw the patient and a brief narrative describing how the patient's clinical condition as seen during that encounter supports that patient's homebound status and need for skilled services.

7.    Defendants violated the False Claims Act when they (a) caused the submission of false or fraudulent Medicare Part A claims for home health care services provided to ineligible beneficiaries, including patients who were not assessed face-to-face by a physician and/or were not homebound; and (b) paid kickbacks to healthcare providers to induce them to refer Medicare beneficiaries for home health care treatments.

8.    The United States and Defendants entered a series of agreements tolling the statute of limitations for any civil claims the United States might assert arising out of or related to allegations that Defendants submitted or caused others to submit false claims for reimbursement of home health services to Federal healthcare programs from July 21, 2017, to July 9, 2024. These agreements toll the statute of limitations from July 9, 2024, to October 31, 2025.

## JURISDICTION AND VENUE

9.      The United States' claims arise under the False Claims Act and federal common law. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1345.

10.     Defendants reside and/or transact business in the Western District of Texas, and their scheme to defraud the United States was carried out in this judicial district. The Court has personal jurisdiction over the Defendants, and venue is appropriate in the Western District of Texas under 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a).

## PARTIES

11.     Plaintiff is the United States of America, acting on behalf of the Department of Health and Human Services ("HHS") and its component agency, the Centers for Medicare and Medicaid Services ("CMS").

12.     Defendant Margaret Ike is a natural person who resides in El Paso, Texas. Ike is a certified registered nurse and is the President of GAHH.

13.     Defendant Del Norte Homecare LLC, also known as Del Norte Home Care LLC, doing business as Guardian Angel Home Health, is a Texas limited liability company. It can be served with process through its registered agent, Paschal Ike, at 1537 N. Zaragoza Road, Suite 1A, El Paso, Texas 79936.

14.     At all times relevant to this Complaint, Ike was responsible for overseeing the submission of Medicare claims for reimbursement on behalf of GAHH.

15.     At all times material to the allegations of this Complaint, Ike was acting within the scope of her authority as a decision-maker for GAHH and at least in part for the purpose of benefiting GAHH.

16.     At all times material to the allegations of this Complaint, GAHH was enrolled as a provider under Medicare Part A.

## THE FALSE CLAIMS ACT

17.     The False Claims Act is the Government's primary civil weapon for combatting fraud. "Congress wrote [the False Claims Act] expansively, meaning 'to reach all types of fraud, without qualification, that might result in a financial loss to the Government.'" *Cook Cnty., Illinois v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003) (quoting *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968)).

18.     Under the False Claims Act, the United States is entitled to recover treble damages and civil penalties from any person who, among other things, "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or "(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1).

19.     A person acts "knowingly" when he or she "has actual knowledge," "acts in deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). A defendant need not have acted with specific intent to defraud. *Id.* § 3729(b)(1)(B).

20.     A "claim" under the False Claims Act includes "any request or demand, whether under a contract or otherwise, for money or property … that is presented to an officer, employee, or agent of the United States." 31 U.S.C. § 3729(b)(2)(A)(i).

21.     A false or fraudulent claim or false statement is "material" for purposes of False Claims Act liability if it has "a natural tendency to influence, or [is] capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

## THE ANTI-KICKBACK STATUTE

22.    The Anti-Kickback Statute prohibits

> knowingly and willfully offer[ing] or pay[ing] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind[,] to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

42 U.S.C. § 1320a-7b(b)(2)(A).

23.    A "Federal health care program" is defined to include "any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government," other than the Federal Employee Health Benefits Program. 42 U.S.C. § 1320a-7b(f). Medicare is a "Federal health care program" under the Anti-Kickback Statute.

24.    "[A] claim that includes items or services resulting from a violation of [the Anti-Kickback Statute] constitutes a false or fraudulent claim for purposes of [the False Claims Act]." 42 U.S.C. § 1320a-7b(g).

25.    Compliance with the Anti-Kickback Statute is an express condition of payment by Medicare. *See, e.g.*, *McNutt ex rel. U.S. v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259 (11th Cir. 2005); *U.S. ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp. 2d 654, 663 (S.D. Tex. 2013), *aff'd*, 587 F. App'x 123 (5th Cir. 2014).

26.    A person "need not have actual knowledge of [the Anti-Kickback Statute] or specific intent to commit a violation of [the Anti-Kickback Statute]" for liability to attach. 42 U.S.C. § 1320a-7b(h).

## FEDERAL COMMON LAW CLAIMS

27.     The United States' claims for unjust enrichment and payment by mistake are governed by federal common law. *See United States ex rel. Campbell v. KIC Dev., LLC*, EP-18-CV-193-KC, 2019 WL 6884485, at *17 (W.D. Tex. Dec. 10, 2019).

28.     Under the doctrine of payment by mistake, the United States can recover funds which its agents have wrongfully, erroneously, or illegally paid. The United States may recover under this theory by showing that "(1) payments were made (2) under the belief that they were properly owed; (3) that belief being erroneously formed; and (4) the mistaken belief was material to the decision to pay." *United States v. Medica-Rents Co.*, 285 F. Supp. 2d 742, 776 (N.D. Tex. 2003), *aff'd*, 2008 WL 3876307 (5th Cir. Aug. 19, 2008).

29.     Under the doctrine of unjust enrichment (also known as "money had and received"), the United States can recover money "dictated by the needs of justice and fairness." *Campbell*, 2019 WL 6884485 at *17 (citation omitted).

## THE MEDICARE PROGRAM

30.     Medicare, which is established by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.*, is a federally funded health insurance program administered by CMS.

31.     To be eligible for Medicare, an individual must be over the age of 65, be disabled, or have end-stage renal disease. 42 U.S.C. § 1395c (citing 42 U.S.C. §§ 426 and 426). Individuals who receive benefits through the Medicare program are commonly referred to as "Medicare beneficiaries."

32.     The Medicare program consists of four parts: Part A (hospital insurance), Part B (medical insurance), Part C (Medicare Advantage), and Part D (prescription drug coverage). Only Part A is at issue in this case. 42 U.S.C. §§ 1395c-1395i.

33.     Part A of the Medicare program provides coverage for institutional health care, including inpatient hospital services. 42 U.S.C. §§ 1395c, 1395d.

34.     To participate in the Medicare program, providers must submit an enrollment application to the applicable Medicare Administrative Contractor ("MAC"), which is a private contractor that processes Medicare claims on behalf of CMS within a particular geographic jurisdiction. The MAC for home health services claims in Texas during the relevant time period was Palmetto GBA, LLC ("Palmetto").

35.     On or about May 15, 2012, Ike submitted a Medicare Part A provider enrollment application on behalf of GAHH to Palmetto. In the application, Ike certified:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. … I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute…), and on the provider's compliance with all applicable conditions of participation in Medicare.

36.     At all times material to the allegations of the Complaint, Defendants submitted electronic claims to Medicare for payment for home health services through Palmetto. To do so, Defendants entered into an Electronic Data Interchange ("EDI") Enrollment Agreement. Ike signed the EDI Enrollment Agreement on behalf of GAHH.

37.     In the EDI Enrollment Agreement, Defendants agreed to "submit claims that are accurate, complete, and truthful." Defendants further acknowledged that "all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under Medicare, and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim that is required pursuant to this agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law."

38.     In addition to contracting with MACs to assist it in administering the Medicare Program, CMS contracts with one or more Unified Program Integrity Contractors ("UPICs"). UPICs support CMS's fraud, waste and abuse activities through audits, medical reviews, and investigations into healthcare providers under Medicare and Medicaid. Among other things, UPICs perform claims review and data analysis for fraud, waste and abuse involving Medicare Part A claims. During the relevant time period, the UPIC for the Southwest Region, which includes Texas, was Qlarant.

## HOME HEALTH SERVICES

39.     Medicare Part A pays for home health services rendered to Medicare beneficiaries who meet specific coverage conditions. Home health services are covered by Medicare Part A if (1) the beneficiary is enrolled in both Medicare Parts A and B, (2) the beneficiary qualifies to receive the home health benefit, (3) the beneficiary stays at least three consecutive days in a hospital, and (4) home health services are initiated and the first visit occurs within 14 days of discharge from the prior hospital stay. 42 U.S.C. § 1395d(a)(3); CMS, Medicare Benefit Policy Manual, Chapter 7 – Home Health Services, § 60.1 – Post-Institutional Home Health Services Furnished During A Home Health Benefit Period – Beneficiaries Enrolled in Part A and Part B. Medicare Part A also covers home health services for beneficiaries enrolled in Medicare Part A but not Medicare Part B. 42 U.S.C. § 1395d(a)(3); CMS, Medicare Benefit Policy Manual, Chapter 7 – Home Health Services, § 60.3 – Beneficiaries Who Are Part A Only or Part B Only.

40.     Covered home health services include part-time or intermittent skilled nursing care, speech-language pathology, physical or occupational therapy, part-time or intermittent home health aide services, and medical social services. 42 U.S.C. § 1395x(m).

41.     A Medicare beneficiary qualifies for home health services only if a physician or other practitioner certifies that (i) the services were required because the beneficiary was confined

to his home ("homebound") and needed skilled nursing care on an intermittent basis or physical or speech therapy; (ii) a plan for furnishing the services to the beneficiary has been established and is periodically reviewed by a physician or other practitioner; (iii) the services were furnished while the beneficiary was under the care of a physician or other practitioner; and (iv) a physician or other practitioner has had a face-to-face encounter with the beneficiary during the prescribed period. 42 U.S.C. §§ 1395f(a)(2)(C), 1395n(a)(2).

42.     To qualify as "homebound," a Medicare beneficiary must meet two criteria. *First*, the beneficiary must either

> Because of illness or injury, need the aid of supportive devices such as crutches, canes, wheelchairs, and walkers; the use of special transportation; or the assistance of another person in order to leave their place of residence

> OR

> Have a condition such that leaving his or her home is medically contraindicated.

*Second*, if the patient meets one of the requirements listed above, he or she must also meet both of the following requirements:

> There must exist a normal inability to leave home;

> AND

> Leaving home must require a considerable and taxing effort.

CMS, Medicare Benefit Policy Manual, Chapter 7 – Home Health Services, § 30.1.1 – Patient Confined to the Home.

43.     As a condition of payment for home health services under the Medicare program, a physician must certify the patient's eligibility for the home health benefit. 42 C.F.R. § 424.22(a)(1). In addition, the Medicare beneficiary's medical records must support the certification of eligibility for home health services. *Id.*

44.    "If the documentation used as the basis for the certification of eligibility is not sufficient to demonstrate that the patient is or was eligible to receive services under the Medicare home health benefit, payment is not rendered for the home health services provided." 42 C.F.R. § 424.22(c)(2).

45.    Certification must occur at the time the plan of care is established or as soon thereafter as possible and must be signed and dated by the physician or other practitioner who establishes the plan of care. 42 C.F.R. § 424.22(a)(2). The initial certification is valid for 60 days. *Id.* § 424.22(b). After the initial 60-day period ends, the physician or other practitioner must recertify the beneficiary's eligibility every 60 days. *Id.*

46.    The home health nursing care and therapy services provided by Medicare are limited to "skilled" services. "To be considered a skilled service, the service must be so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel." 42 C.F.R. § 409.32(a).

47.    At all times material to the Complaint, Medicare paid home health providers under the Prospective Payment System ("PPS"). 42 U.S.C. § 1395fff. Prior to January 1, 2020, home health providers were paid under the PPS for 60-day episodes of care that included all covered home health services. Beginning January 1, 2020, home health providers were paid under the PPS for 30-day episodes of care. *See* Pub. L. No. 115–123, §51001(a), 132 Stat. 64, 289–90 (2018). Although the unit of payment for home health services is a 30-day period, re-certifying eligibility and reviewing the home health plan of care continue to be required every 60 days.

48.    The PPS payment is adjusted for case-mix and area wage differences. 42 U.S.C. § 1395fff(b)(4). In other words, PPS payments are based on the characteristics of the patient and his or her corresponding needs (case-mix) as well as the relevant level of wages and labor costs in

the area where services are provided (area wage). *See* CMS, Medicare Benefit Policy Manual, Chapter 7 – Home Health Services, § 10.2 – Adjustments to the 30-Day Period Payment Rate.

49.    The PPS rate is intended to reimburse the home health provider for all reasonable and necessary nursing and therapy services, medical supplies, and home health aide and medical social services required for the care of a beneficiary during the episode of care. 42 U.S.C. § 1395fff(b)(1).

50.    At the beginning of each sixty-day episode of care, the home health provider assesses the patient's condition and likely need for skilled nursing care or therapy using an instrument called the Outcome and Assessment Information Set ("OASIS"). 42 C.F.R. § 484.55.

51.    Prior to January 1, 2020, home health payment was adjusted for certain patient characteristics and therapy visit intensity. This information was obtained from the OASIS form, which contains certain data elements designed to assess a patient's "clinical severity domain," "functional status domain," and "service utilization domain." 42 C.F.R. § 484.55(c). Each data element is assigned a score value. The sum of these scores resulted in a five-digit alpha-numeric Health Insurance Prospective Payment System ("HIPPS") code, each of which is a case-mix group that in part determines the amount the home health provider will be reimbursed. *See* CMS Division of Institutional Claims Processing, Definition and Uses of Health Insurance Prospective Payment System Codes (HIPPS Codes).

52.    After January 1, 2020, Medicare used a new system known as the Patient Driven Groupings Model ("PDGM") to adjust home health payments. The PDGM considers information from Medicare claims (i.e., admission source and timing, principal and secondary diagnoses) as well as the OASIS form (i.e., functional impairment level). The result of the PDGM continues to

be a five-digit alpha-numeric HIPPS code. Under PDGM, there are 432 HIPPS codes compared to 153 HIPPS codes prior to January 1, 2020.

53.     Because "Medicare determines how much will be paid for each episode [of care] based, in part, on the patient's diagnosis, … false or erroneous entries on the OASIS form can ultimately result in higher Medicare reimbursements" to home health services providers. *United States v. Nora*, 988 F.3d 823, 825–26 (5th Cir. 2021).

## DEFENDANTS' SCHEME TO DEFRAUD THE UNITED STATES

**I.  Defendants Caused Claims to be Submitted to the Medicare Part A Program for Home Health Care Treatments for Ineligible Patients.**

54.     Defendants systematically billed Medicare Part A for home health services provided to ineligible beneficiaries. These beneficiaries were ineligible because:

   a.   their certification of home health eligibility was not supported by medical records;

   b.   the services they received were not "skilled" nursing services (i.e., the services were not sufficiently complex and/or did not require supervision);

   c.   they were not seen face-to-face by a physician or other provider; and/or

   d.   they were not homebound.

55.     Defendants knew that many of their patients were not eligible to receive home health care services. Ike directed GAHH employes to change notes in medical records to match a patient's plan of care regardless of the services provided, to falsify information on OASIS forms to make patients appear sicker than they were to justify the need for skilled services and increase reimbursement amounts, and to forge physician signatures.

56.     Defendants' false statements in medical records and false claims for reimbursement for home health services were material to the Medicare Program's payment decision. Eligibility criteria set forth in the Medicare regulations must be met before CMS will pay for home health

services. CMS would not have paid Defendants had it known that the Medicare beneficiaries receiving services were not eligible.

57.    Defendants' false claims caused damages to the Medicare Program in an amount to be proven at trial.

58.    Between July 10, 2018, and June 10, 2025, GAHH submitted 4,415 claims for home health services to Part A, and Medicare paid GAHH $7,244,075.21 for those claims. Upon information and belief, more than 90% of these claims were false or fraudulent.

### A. Examples of False Claims

59.    The following paragraphs discuss improper claims submitted by GAHH for beneficiaries who were not eligible to receive home health services. The United States anticipates identifying additional ineligible Medicare beneficiaries during discovery and at trial.

### Jacqueline A.

60.    GAHH submitted a false or fraudulent claim to Medicare Part A for home health services provided to Medicare beneficiary Jacqueline A. between July 5, 2019, and September 2, 2019. This was the third episode of care following a start-of-care date of March 7, 2019.

61.    The beneficiary's plan of care required a nurse to provide weekly visits to assess, observe, and provide education for a primary diagnosis of spondylosis without myelopathy or radiculopathy, cervical region.

62.    There were no recent inpatient hospitalizations documented for the beneficiary, who was described in the initial OASIS form as an 89-year-old woman living with family members who assisted with daily care needs. The OASIS form documented that the beneficiary ambulated without an assistive device and was able to perform her own finger stick blood glucose testing.

63.    The beneficiary's medical records did not include a recertification OASIS to support the episode.

64.    The skilled nursing visit notes documented that the beneficiary's vital signs were mostly within normal limits, respiratory and dietary status was stable, and there was no skin breakdown noted. Documentation related to "generalized teaching" was limited and redundant. The services provided did not meet the criteria of a skilled need that required a nurse to perform.

65.    The medical records were insufficient to support homebound status. The skilled nurse's notes documented that the beneficiary was up as tolerated, and no assistive device was required. There was no documentation of a recent inpatient hospitalization, physical decline and/or change in function to support a homebound status. The records did not support a finding that it was medically contraindicated for the beneficiary to leave the home or that it was a taxing effort to leave the home.

66.    The medical records did not include a face-to-face encounter form. The physician encounter notes did not include a discussion and/or treatment plan for a referral and/or recommendation of home health services. A form on GAHH letterhead titled "F2F Encounter" was blank and was not signed or dated by the treating physician.

**Stella A.**

67.    GAHH submitted a false or fraudulent claim to Medicare Part A for home health services provided to Medicare beneficiary Stella A. between March 4, 2019, and May 2, 2019. This was the ninth episode of care following a start-of-care date of November 9, 2017.

68.    The beneficiary's recertification plan of care required a nurse to provide weekly visits to assess, observe and provide education for a primary diagnosis of iron deficiency anemia. There were no recent inpatient hospitalizations documented.

69.    The skilled nursing visit notes documented that the beneficiary's vital signs were mostly within normal limits, respiratory and dietary status was stable, and there was no skin

breakdown noted. Documentation related to "generalized teaching" was limited and redundant. The services provided did not meet the criteria of a skilled need that required a nurse to perform.

70.    There were 15 visits for physical therapy billed during this episode. The physical therapy evaluation documented that the beneficiary was up as tolerated with a walker. There was no documentation to support that the beneficiary had a recent hospitalization, decline, or change in function that would warrant physical therapy in the home. Due to the lack of objective and measurable goals and progress, the documentation did not meet the criteria for a skilled need.

71.    The medical records were insufficient to support homebound status. The records did not support a finding that it was medically contraindicated for the beneficiary to leave the home or that it was a taxing effort to leave the home.

72.    The face-to-face encounter form submitted by GAHH was invalid. A form on GAHH letterhead titled "F2F Encounter" was blank and was not signed or dated by the treating physician. Additionally, the medical records did not include an encounter visit note to support the clinical rationale for home health services.

73.    The Government interviewed Dr. Georgina Escandon, who treated Stella A. Dr. Escandon stated that the signature on the beneficiary's physical therapy evaluation form was "definitely not" her signature.

74.    The beneficiary's medical records also included an unsigned physical therapy evaluation form for services on March 12, 2018. There were no corresponding medical notes.

**Amelia A.**

75.    GAHH submitted a false or fraudulent claim to Medicare Part A for home health services provided to Medicare beneficiary Amelia A. on October 11, 2018. This was the first episode of care.

76.    The beneficiary's plan of care required a nurse to provide weekly visits to assess, observe and provide education for a primary diagnosis of Type 2 diabetes mellitus. There were no inpatient hospitalizations documented since 2013.

77.    The OASIS form for the beneficiary stated that she had been diagnosed with diabetes more than 20 years before receiving home health services. The beneficiary was identified as non-insulin dependent and living with a caregiver who assisted with blood glucose checks.

78.    The skilled nursing visit notes documented that the beneficiary's vital signs were mostly within normal limits, respiratory and dietary status was stable, and there was no skin breakdown noted. The services provided (generalized teaching) did not meet the criteria of a skilled need that required a nurse to perform.

79.    The medical records were insufficient to support homebound status. The records did not support a finding that it was medically contraindicated for the beneficiary to leave the home or that it was a taxing effort to leave the home.

80.    The face-to-face encounter form submitted by GAHH was invalid. A form on GAHH letterhead titled "F2F Encounter" was blank and was not signed or dated by the treating physician. Additionally, the medical records did not include an encounter visit note to support the clinical rationale for home health services.

81.    The beneficiary's plan of care was invalid because it was not signed by a physician until December 6, 2018, which is after the beneficiary was discharged from services.

**Ed B.**

82.    GAHH submitted a false or fraudulent claim to Medicare Part A for home health services provided to Medicare beneficiary Ed B. between February 10, 2020, and March 10, 2020. This was the 34th episode of care following a start-of-care date of December 8, 2014.

83.    The beneficiary's recertification plan of care required a nurse to provide weekly visits to assess, observe and provide education for a primary diagnosis of chronic obstructive pulmonary disease ("COPD"). However, the recertification OASIS form documented a conflicting primary diagnosis of heart disease.

84.    The documentation noted no inpatient hospitalizations since 2006.  The skilled nursing visit notes documented that the beneficiary's vital signs were mostly within normal limits, respiratory and dietary status was stable, and there was no skin breakdown noted. The notes also stated that the beneficiary lived with another person who assisted with daily care needs. Recertification for a 34th episode of home health services for generalized teaching did not meet the criteria of a skilled need that required a nurse to perform.

85.    The medical records were insufficient to support homebound status. The skilled nurse noted that the beneficiary was up as tolerated with a walker. The documented physical limitations did not support a finding that it was medically contraindicated for the beneficiary to leave the home or that it was a taxing effort to leave the home.

86.    The face-to-face encounter form submitted by GAHH was invalid. A form on GAHH letterhead titled "F2F Encounter" was blank and was not signed or dated by the treating physician. Additionally, the encounter visit note from the treating physician was insufficient to support the clinical rationale for home health services.

87.    The beneficiary's plan of care was invalid because it was not signed and dated by a physician.

**Santiago B.**

88.    GAHH submitted a false or fraudulent claim to Medicare Part A for home health services provided to Medicare beneficiary Santiago B. between December 25, 2019, and

February 22, 2020. This was the 31st episode of care following a start-of-care date of January 20, 2015.

89.    In total, Defendants billed at least 61 claims for home health services provided to this beneficiary between January 20, 2015, and September 10, 2022.

90.    The beneficiary's recertification plan of care required a nurse to provide weekly visits to assess, observe and provide education for a primary diagnosis of COPD. However, the beneficiary's treating physician identified no complaints or concerns. Medical records showed the beneficiary denied any increase in shortness of breath, cough, wheezing, or fever. He had not been hospitalized since 2015.

91.    The skilled nursing visit notes documented that the beneficiary's vital signs were mostly within normal limits, respiratory and dietary status was stable, and there was no skin breakdown noted. The notes documented "verbal [teaching] from nursing manual," but there was no documentation to support a percentage of understanding by the beneficiary and no change in the way the nurse provided teaching. Recertification for a 31st episode of home health services for generalized teaching did not meet the criteria of a skilled need that required a nurse to perform.

92.    The medical records were insufficient to support homebound status. The skilled nurse noted that the beneficiary was up as tolerated with a cane as needed. There was no documentation of a recent decline or change in function. The documented physical limitations did not support a finding that it was medically contraindicated for the beneficiary to leave the home or that it was a taxing effort to leave the home.

93.    The face-to-face encounter form submitted by GAHH was invalid. A form on GAHH letterhead titled "F2F Encounter" was blank and was not signed or dated by the treating physician. Additionally, the encounter visit note from the treating physician on January 15, 2019,

was insufficient to support the clinical rationale for home health services. The note simply stated that the beneficiary came to the clinic "for a follow up on lab results with no complaints."

94.     The Government interviewed Santiago B. He confirmed that he received home health services but stated that he stopped driving because of a lack of insurance rather than any medical condition; that he has no physical restrictions; and that he can use public transportation to leave his house. He stated that the services he received were limited to a nurse checking his vital signs and teaching him how to care for his illness.

95.     The Government also interviewed Dr. Martha Manquera-Butler, who treated Santiago B. Dr. Manquera-Butler stated that the signature on a 60-day summary form in GAHH's records, which was dated September 15, 2015, was not her signature. Dr. Manquera-Butler also stated that the signature on Form CMS-485 (home health certification and plan of care) dated August 25, 2015, was not her signature. Dr. Manquera-Butler also noted that her clinic notes reported that Santiago B. was not homebound.

96.     The Government also interviewed Dr. Kevin Sandberg, who GAHH identified as Santiago B.'s attending physician at his start of care in 2015. Dr. Sandberg verified his initial plan of care signature in connection with his referral of the beneficiary for physical therapy in January 2015. However, Dr. Sandberg stated that signatures on three subsequent orders for GAHH services and supplies were not his signature.

**Gregorio H.**

97.     GAHH submitted a false or fraudulent claim to Medicare Part A for home health services provided to Medicare beneficiary Gregorio H. between November 21, 2018, and January 19, 2019. This was the seventh episode of care following a start-of-care date of July 29, 2017.

98.     The beneficiary's recertification plan of care required a nurse to provide weekly visits to assess, observe and provide education for a primary diagnosis of Type 2 diabetes mellitus. There was no documentation of when the beneficiary was diagnosed with diabetes.

99.     The beneficiary lived with another person fulltime who assisted with care needs. The skilled nursing visit notes documented that the beneficiary's vital signs were mostly within normal limits, respiratory and dietary status was stable, and the patient verbalized understanding on the nurse's teaching. There was no documentation of a recent acute decline or change in clinical condition related to the diagnosis of diabetes. Recertification for a seventh episode of home health services did not meet the criteria of a skilled need that required a nurse to perform.

100.    The medical records were insufficient to support homebound status. The skilled nurse noted that the beneficiary was up as tolerated with an assistive device. The documented physical limitations did not support a finding that it was medically contraindicated for the beneficiary to leave the home or that it was a taxing effort to leave the home.

101.    The face-to-face encounter form submitted by GAHH was invalid. A form on GAHH letterhead titled "F2F Encounter" was blank and was not signed or dated by the treating physician.

**Ramon H.**

102.    GAHH submitted a false or fraudulent claim to Medicare Part A for home health services provided to Medicare beneficiary Ramon H. between April 27, 2019, and June 25, 2019. This was the 21st episode of care following a start-of-care date of January 13, 2016.

103.    The beneficiary's recertification plan of care required a nurse to provide weekly visits to assess, observe and provide education for a primary diagnosis of essential hypertension.

104.    The beneficiary lived with a family member who assisted with care needs. The skilled nursing visit notes documented that the beneficiary vital signs were mostly within normal limits, respiratory and dietary status was stable, and the nurse reviewed medications with the patient's daughter. There was no documentation of a recent acute decline or change in clinical condition related to the diagnosis. Recertification for a 21st episode of home health services did not meet the criteria of a skilled need that required a nurse to perform.

105.    There were 15 visits for physical therapy billed during this episode. The physical therapy evaluation documented that the beneficiary was up as tolerated with a cane/walker. There was no documentation of a recent hospitalization, decline, or change in function that would warrant physical therapy in the home. Due to the lack of objective and measurable goals and progress, the documentation did not meet the criteria for a skilled need.

106.    The medical records were insufficient to support homebound status. The skilled nurse noted that the beneficiary was up as tolerated with an assistive device. The documented physical limitations did not support a finding that it was medically contraindicated for the beneficiary to leave the home or that it was a taxing effort to leave the home.

107.    The medical records did not include a face-to-face encounter form for the start-of-care date. There were no clinical encounter notes from a treating physician to support homebound status at the time home health services were initiated.

**Martin L.**

108.    GAHH submitted a false or fraudulent claim to Medicare Part A for home health services provided to Medicare beneficiary Martin L. between December 21, 2019, and February 18, 2020. This was the third episode of care following a start-of-care date of August 23, 2019.

109.    The beneficiary's plan of care included weekly visits to assess, observe, and provide education for a diagnosis of Type 2 diabetes mellitus. There was no documentation of when the beneficiary was diagnosed with diabetes.

110.    Notes in the medical record indicated that the beneficiary lived with a caregiver. The skilled nurse documented that vital signs were mostly within normal limits, respiratory and dietary status was stable, and the beneficiary's caregiver performed blood glucose checks. There was no documentation of a recent acute decline or change in clinical condition related to the primary diagnosis. Recertification for a third episode of home health services did not meet the criteria of a skilled need that required a nurse to perform.

111.    The medical records were insufficient to support homebound status. The skilled nurse noted that the beneficiary was up as tolerated with an assistive device. The documented physical limitations did not support a finding that it was medically contraindicated for the beneficiary to leave the home or that it was a taxing effort to leave the home.

112.    The face-to-face encounter form submitted by GAHH was invalid. A form on GAHH letterhead titled "F2F Encounter" was blank and was not signed or dated by the treating physician. The records did not include a recent clinical encounter with the treating physician.

113.    The beneficiary's plan of care was invalid because it was not signed by a physician until March 12, 2020, a month after services were completed.

**Carmen L.**

114.    GAHH submitted a false or fraudulent claim to Medicare Part A for home health services provided to Medicare beneficiary Carmen L. between July 18, 2019, and September 12, 2019. This was the 19th episode of care following a start-of-care date of July 30, 2016.

115.    The beneficiary's plan of care included weekly visits to assess, observe, and provide education for a diagnosis of essential primary hypertension.

116.    The beneficiary lived with another person who assisted with care needs. The skilled nurse documented that vital signs were mostly within normal limits, respiratory and dietary status was stable, and generalized teaching was provided to both the patient and the caregiver. There was no documentation of a recent acute decline or change in clinical condition related to the primary diagnosis. Recertification for a 19th episode of home health services did not meet the criteria of a skilled need that required a nurse to perform.

117.    The medical records were insufficient to support homebound status. The skilled nurse noted that the beneficiary was up as tolerated with an assistive device as needed. The beneficiary had not been hospitalized since 1998. The documented physical limitations did not support a finding that it was medically contraindicated for the beneficiary to leave the home or that it was a taxing effort to leave the home.

118.    The face-to-face encounter form submitted by GAHH was insufficient to support the need for skilled services. A form on GAHH letterhead titled "F2F Encounter" included only limited information and did not include the homebound status of the beneficiary at the time of the encounter.

**Olivia M.**

119.    GAHH submitted a false or fraudulent claim to Medicare Part A for home health services provided to Medicare beneficiary Olivia M. between April 13, 2019, and June 11, 2019. This was the tenth episode of care following a start-of-care date of October 20, 2017.

120.    The beneficiary's plan of care included weekly visits to assess, observe, and provide education for a diagnosis of hypertensive heart and chronic kidney disease.

23

121.    The beneficiary lived with another person who assisted with care needs. The skilled nurse documented that vital signs were mostly within normal limits, respiratory and dietary status was stable, and generalized teaching was provided to the patient and caregiver. The beneficiary had not been hospitalized since 2016. There was no documentation of a recent acute decline or change in clinical condition related to the primary diagnosis. Recertification for a tenth episode of home health services did not meet the criteria of a skilled need that required a nurse to perform.

122.    There was no face-to-face encounter form for the start-of-care date. An encounter visit note dated April 2, 2019, was insufficient to warrant ongoing home health services.

123.    The beneficiary's plan of care was invalid because it was not signed and dated by a physician.

**Esperanza M.**

124.    GAHH submitted a false or fraudulent claim to Medicare Part A for home health services provided to Medicare beneficiary Esperanza M. between December 22, 2018, and February 19, 2019. This was the 14th episode of care following a start-of-care date of November 2, 2016.

125.    The beneficiary's recertification plan of care included weekly visits to assess, observe, and provide education for a diagnosis of Type 2 diabetes mellitus. There was no documentation of when the beneficiary was diagnosed with diabetes.

126.    The beneficiary lived with another person who assisted with care needs. The skilled nurse documented that vital signs were mostly within normal limits, respiratory and dietary status was stable, and diabetes was controlled with oral hypoglycemics and diet. There was no documentation of a recent acute decline or change in clinical condition related to the primary

diagnosis. Recertification for a 14th episode of home health services did not meet the criteria of a skilled need that required a nurse to perform.

127.    There were 13 visits for physical therapy billed during this episode. The physical therapy evaluation documented that the beneficiary was up as tolerated with an assistive device as needed. There was no documentation of a recent hospitalization, decline, or change in function that would warrant physical therapy in the home. Due to the lack of objective and measurable goals and progress, the documentation did not meet the criteria for a skilled need.

128.    The medical records were insufficient to support homebound status. The skilled nurse noted that the beneficiary was up as tolerated with an assistive device as needed. There was no documented inpatient hospitalization since 2017. The documented physical limitations did not support a finding that it was medically contraindicated for the beneficiary to leave the home or that it was a taxing effort to leave the home.

129.    The medical records did not include a face-to-face encounter form for the start-of-care date. There were no clinical encounter notes from the referring physician prior to the start-of-care date. The most recent encounter note stated that the beneficiary was seen for a "Medicare annual well visit" and did not note a decline or acute issue related to the primary diagnosis.

**Maria M.**

130.    GAHH submitted a false or fraudulent claim to Medicare Part A for home health services provided to Medicare beneficiary Maria M between June 25, 2018, and August 23, 2018. This was the ninth episode of care following a start-of-care date of March 2, 2017.

131.    The beneficiary's recertification plans of care included weekly visits to assess, observe, and provide education for a diagnosis of Type 2 diabetes mellitus. There was no documentation of when the beneficiary was diagnosed with diabetes.

25

132.    The beneficiary lived with another person who assisted with care needs. The skilled nurse documented that vital signs were mostly within normal limits and respiratory and dietary status was stable. There was no documentation of a recent acute decline or change in clinical condition related to the primary diagnosis. Recertification for a ninth episode of home health services did not meet the criteria of a skilled need that required a nurse to perform.

133.    The medical records were insufficient to support homebound status. The skilled nurse noted that the beneficiary was up as tolerated with an assistive device as needed. There were no documented inpatient hospitalizations in the medical records. The documented physical limitations did not support a finding that it was medically contraindicated for the beneficiary to leave the home or that it was a taxing effort to leave the home.

134.    The face-to-face encounter form submitted by GAHH was invalid. A form on GAHH letterhead titled "F2F Encounter" was blank and was not signed or dated by the treating physician. The records did not include a recent clinical encounter with the treating physician prior to the start-of-care date.

**Josefina M.**

135.    GAHH submitted a false or fraudulent claim to Medicare Part A for home health services provided to Medicare beneficiary Josefina M. between October 4, 2019, and December 2, 2019. This was the first episode of care.

136.    The beneficiary's plan of care included weekly visits to assess, observe, and provide education for a diagnosis of generalized osteoarthritis. The beneficiary had not been hospitalized since 1998.

137.    The skilled nurse documented that vital signs were mostly within normal limits, respiratory and dietary status was stable, and generalized teaching was provided to the beneficiary.

There was no documentation of a recent acute decline or change in clinical condition related to the primary diagnosis. Certification for home health services did not meet the criteria of a skilled need that required a nurse to perform.

138.    There were 16 visits for physical therapy billed during this episode. The physical therapy evaluation documented that the beneficiary was up as tolerated and ambulated with a cane "home/community distances." There was no documentation of a recent hospitalization, decline, or change in function that would warrant physical therapy in the home. Due to the lack of objective and measurable goals and progress, the documentation did not meet the criteria for a skilled need.

139.    The medical records were insufficient to support homebound status. The documented physical limitations did not support a finding that it was medically contraindicated for the beneficiary to leave the home or that it was a taxing effort to leave the home.

140.    The face-to-face encounter form submitted by GAHH was invalid. A form on GAHH letterhead titled "F2F Encounter" was blank and was not signed or dated by the treating physician. The records did not include a recent clinical encounter with the treating physician.

### Peggy M.

141.    GAHH submitted a false or fraudulent claim to Medicare Part A for home health services provided to Medicare beneficiary Peggy M. between July 12, 2018, and September 9, 2018. This was the eighth episode of care following a start-of-care date of May 18, 2017.

142.    The beneficiary's recertification plan of care required a nurse to provide weekly visits to assess, observe and provide education for a primary diagnosis of hypertensive chronic kidney disease. There were no documented inpatient hospitalizations.

143.    The beneficiary lived with another person who assisted with care needs and checked her blood sugar levels. The skilled nurse documented that vital signs were mostly within

normal limits, respiratory and dietary status was stable, and generalized teaching was provided to the beneficiary. There was no documentation of a recent acute decline or change in clinical condition related to the primary diagnosis. Recertification for an eighth episode of home health services did not meet the criteria of a skilled need that required a nurse to perform.

144.    The medical records were insufficient to support homebound status. The documented physical limitations did not support a finding that it was medically contraindicated for the beneficiary to leave the home or that it was a taxing effort to leave the home.

145.    There was no face-to-face encounter form for the episode of care. There was an encounter note with the treating physician noting that the beneficiary was evaluated for COPD. The encounter note did not include a referral or recommendation for home health services.

### Rafael M.

146.    GAHH submitted a false or fraudulent claim to Medicare Part A for home health services provided to Medicare beneficiary Rafael M. between December 23, 2019, and February 20, 2020. This was the second episode of care following a start-of-care date of October 24, 2019.

147.    The beneficiary's recertification plan of care required a nurse to provide weekly visits to assess, observe and provide education for a primary diagnosis of hypertensive heart disease.

148.    The beneficiary lived with another person who assisted with care needs. The skilled nurse documented that vital signs were mostly within normal limits, respiratory and dietary status was stable, and generalized teaching was provided to both patient and caregiver. The documentation did not show an acute decline or change in clinical condition relating to the primary

diagnosis. Recertification for a second episode of home health services did not meet the criteria of a skilled need that required a nurse to perform.

149.    The medical records were insufficient to support homebound status. The skilled nurse documented that the beneficiary was up as tolerated with an assistive device as needed. The documented physical limitations did not support a finding that it was medically contraindicated for the beneficiary to leave the home or that it was a taxing effort to leave the home.

150.    The face-to-face encounter form submitted by GAHH was invalid. A form on GAHH letterhead titled "F2F Encounter" was blank and was not signed or dated by the treating physician. On October 20, 2019, the treating physician documented that the beneficiary's condition was "stable" and that he could "resume regular activity."

151.    The beneficiary's plan of care was invalid because it was not signed by a physician until February 18, 2020, at the end of the episode of care.

**Primitivo N.**

152.    GAHH submitted a false or fraudulent claim to Medicare Part A for home health services provided to Medicare beneficiary Primitivo N. between December 30, 2018, and February 27, 2019. This was the 33rd episode of care following a start-of-care date of September 27, 2013.

153.    Defendants billed for physical therapy and skilled nursing services. However, the medical records did not include any documentation of services rendered to the beneficiary. Medicare guidelines require home health providers to maintain supporting documentation.

**Rodolfo R.**

154.    GAHH submitted false or fraudulent claims to Medicare Part A for home health services provided to Medicare beneficiary Rodolfo R. between November 19, 2018, and

January 17, 2019, and between January 18, 2019, and March 18, 2019. These were the 11th and 12th episodes of care following a start-of-care date of March 29, 2017.

155. The beneficiary's recertification plan of care for the 11th episode of care included weekly visits to assess, observe, and provide education for a diagnosis of Type 2 diabetes mellitus. There was no documentation of when the beneficiary was diagnosed with diabetes. The medical records did not include a recertification OASIS for this episode of care.

156. The beneficiary's recertification plan of care for the 12th episode of care included weekly visits to assess, observe, and provide education for a diagnosis of chronic kidney disease. The medical records did not include a recertification OASIS for this episode of care.

157. The beneficiary lived with another person fulltime who assisted with care needs. The skilled nurse documented that vital signs were mostly within normal limits and respiratory and dietary status was stable. The documentation did not show an acute decline or change in clinical condition relating to the primary diagnoses. Recertification for an 11th and 12th episode of home health services did not meet the criteria of a skilled need that required a nurse to perform.

158. There were seven visits for physical therapy billed during the 11th episode of care. The physical therapy notes indicated that the beneficiary was able to ambulate with a rolling walker. Due to the lack of objective and measurable goals and progress, the documentation did not meet the criteria for a skilled need.

159. The medical records were insufficient to support homebound status. The documented physical limitations did not support a finding that it was medically contraindicated for the beneficiary to leave the home or that it was a taxing effort to leave the home.

160. The face-to-face encounter forms submitted by GAHH were invalid. For each episode of care, a form on GAHH letterhead titled "F2F Encounter" was blank and was not signed

or dated by the treating physician. The records included an encounter visit note with the treating physician stating that the beneficiary was evaluated for an "initial visit" and that the "patient's family is requesting home health services." However, there was no documentation to support an acute clinical issue related to the primary diagnoses or rationale for continuation of home health services.

**Rosalia R.**

161.    GAHH submitted a false or fraudulent claim to Medicare Part A for home health services provided to Medicare beneficiary Rosalia R. between March 5, 2019, and May 3, 2019. This was the eighth episode of care following a start-of-care date of January 9, 2018.

162.    The beneficiary's recertification plan of care required a nurse to provide weekly visits to assess, observe and provide education for a primary diagnosis of hypertensive chronic kidney disease. The medical records did not include a recertification OASIS for this episode of care.

163.    The beneficiary received care assistance from an outside agency and family members. The skilled nurse documented that vital signs were mostly within normal limits, respiratory and dietary status was stable, and medications were reviewed with both patient and caregiver. Recertification for an eighth episode of home health services for generalized teaching did not meet the criteria of a skilled need that required a nurse to perform.

164.    There were 15 visits for physical therapy billed during this episode. The physical therapy notes documented that the beneficiary was able to ambulate with a cane and walker as needed. There was no documentation of a recent hospitalization, decline, or change in function that would warrant physical therapy in the home. The beneficiary had not been hospitalized since

2014. Due to the lack of objective and measurable goals and progress, the documentation did not meet the criteria for a skilled need.

165.    The medical records were insufficient to support homebound status. The documented physical limitations did not support a finding that it was medically contraindicated for the beneficiary to leave the home or that it was a taxing effort to leave the home.

166.    The face-to-face encounter form submitted by GAHH was invalid. A form on GAHH letterhead titled "F2F Encounter" was blank and was not signed or dated by the treating physician. The records did not include a recent clinical encounter with the treating physician.

**Rachel S.**

167.    GAHH submitted a false or fraudulent claim to Medicare Part A for home health services provided to Medicare beneficiary Rachel S. between November 6, 2019, and January 4, 2020. This was the eighth episode of care following a start-of-care date of September 12, 2018.

168.    The beneficiary's recertification plan of care required a nurse to provide weekly visits to assess, observe and provide education for a primary diagnosis of lumbar radiculopathy. There were no documented inpatient hospitalizations since 2009.

169.    The beneficiary lived with another person who assisted with care needs. The skilled nurse documented that vital signs were mostly within normal limits, respiratory and dietary status was stable, and teaching was provided to both patient and caregiver. Recertification for an eighth episode of home health services did not meet the criteria of a skilled need that required a nurse to perform.

170.    The medical records were insufficient to support homebound status. The skilled nurse noted that the beneficiary was up as tolerated with a walker. The documented physical

limitations did not support a finding that it was medically contraindicated for the beneficiary to leave the home or that it was a taxing effort to leave the home.

171.    The face-to-face encounter form submitted by GAHH was insufficient to support the homebound status of the beneficiary. The documentation was brief and did not include the specific clinical conditions to support the need for home health services. The records did not include an encounter with the treating physician prior to the start-of-care date.

**Martha S.**

172.    GAHH submitted a false or fraudulent claim to Medicare Part A for home health services provided to Medicare beneficiary Martha S. between January 25, 2019, and March 25, 2019. This was the third episode of care following a start-of-care date of September 27, 2018.

173.    The beneficiary's recertification plan of care required a nurse to provide weekly visits to assess, observe and provide education for a primary diagnosis of bilateral primary osteoarthritis of knee. There were no documented inpatient hospitalizations since 2015. The medical records did not include a recertification OASIS for this episode of care.

174.    The beneficiary lived with another person who assisted with care needs. The skilled nurse documented that vital signs were mostly within normal limits, respiratory and dietary status was stable, and teaching was provided to the caregiver. Recertification for a third episode of home health services did not meet the criteria of a skilled need that required a nurse to perform.

175.    The medical records were insufficient to support homebound status. The documented physical limitations did not support a finding that it was medically contraindicated for the beneficiary to leave the home or that it was a taxing effort to leave the home.

176.    The face-to-face encounter form submitted by GAHH was insufficient to support the homebound status of the beneficiary. The documentation was brief, did not include the specific

clinical conditions to support the need for home health services, and did not note the homebound status of the beneficiary at the time of encounter. The records did not include an encounter with the treating physician prior to the start-of-care date.

**Miriam V.**

177.    GAHH submitted a false or fraudulent claim to Medicare Part A for home health services provided to Medicare beneficiary Miriam V. between October 26, 2018, and December 24, 2018. This was the fifth episode of care following a start-of-care date of February 28, 2018.

178.    The beneficiary's recertification plan of care required a nurse to provide weekly visits to assess, observe and provide education for a primary diagnosis of hypertensive chronic kidney disease. There were no documented inpatient hospitalizations. The medical records did not include a recertification OASIS for this episode of care.

179.    The beneficiary lived with another person who assisted with care needs. The skilled nurse documented that vital signs were mostly within normal limits, respiratory and dietary status was stable, and medications were reviewed with both patient and caregiver. Recertification for a fifth episode of home health services for generalized teaching did not meet the criteria of a skilled need that required a nurse to perform.

180.    The medical records were insufficient to support homebound status. The documented physical limitations did not support a finding that it was medically contraindicated for the beneficiary to leave the home or that it was a taxing effort to leave the home

181.    The face-to-face encounter form submitted by GAHH was invalid. A form on GAHH letterhead titled "F2F Encounter" was blank and was not signed or dated by the treating physician. There were no encounter notes or third-party records to support the homebound status of the beneficiary at the time of the encounter.

**Larry E.**

182.    GAHH submitted a false or fraudulent claim to Medicare Part A for home health services provided to Medicare beneficiary Larry E.

183.    GAHH submitted 42 claims to Medicare Part A for home health services provided to this beneficiary between March 7, 2016, and April 4, 2023.

184.    GAHH claimed that it provided the beneficiary with services relating to an unspecified injury of an extensor muscle, injury to fascia and tendon of left middle finger at wrist, post-traumatic stress disorder ("PTSD"), unspecific internal derangement of left knee, and migraines.

185.    The Government interviewed Larry E., who confirmed he received home health services that included vitals checks, medical checks, physical therapy, and assistance with bathing and other daily activities. However, while he identified a <u>right</u> knee surgery in 2001, he claimed that he had never had an injury to his <u>left</u> knee and had never had injuries to his hands or fingers requiring home health care. He also stated that his migraines did not require home health care, that he received PTSD treatment through the Department of Veterans Affairs rather than GAHH, and that he was able to drive and leave the house.

**B.  Falsified Medical Records and Ignored Billing Recommendations**

186.    Defendants falsified medical records and documentation to bill for home health services provided to Medicare beneficiaries they knew were ineligible.

187.    A GAHH employee who worked as a licensed vocational nurse ("LVN") was often asked by Ike to "tweak" her notes to match a patient's plan of care rather than the services provided. Ike continued to contact the LVN for a year after she left GAHH to try to get her to make changes to her notes.

188.    A GAHH quality assurance employee often required nurses to make "corrections" to notes to ensure that GAHH would be paid on claims.

189.    A GAHH employee who worked as a "runner" was responsible for taking orders to doctors for their signatures.

190.    At least one doctor complained to the runner that he had not personally treated some of the patients but that he had to sign since services had already been rendered.

191.    Ike ordered the runner to take forms to the officer manager for signature if a physician's signature could not be obtained.

192.    The runner witnessed the GAHH office manager forging signatures on unsigned orders after asking the runner to block the security camera view.

193.    Another LVN employed by GAHH often received unsigned orders and was asked to provide services to patients who did not meet the requirements for home health services.

194.    The LVN stated that Ike would talk patients into continuing home health services after they completed the treatments. Ike had connections with several doctors and paid "appreciation gifts" to referring physicians.

195.    Ike directed staff to make patients appear as sick as possible in paperwork. Ike would demand that nurses rate patient scores lower than they should have been in order to receive reimbursement from Medicare.

196.    GAHH had hired a consultant to provide training on Medicare requirements, but Ike did not heed the consultant's recommendations.

197.    One of the coders who worked for the consultant told the Government that GAHH ignored her recommendations. The coder noted that she consistently provided the same recommendations to GAHH, which indicated that GAHH was not implementing them.

## II. Defendants Knowingly and Willfully Paid Kickbacks to Healthcare Providers to Induce Them to Refer Patients for Home Health Care Treatments.

198.    Defendants also submitted false or fraudulent Medicare claims for home health services that were tainted by improper kickbacks.

199.    GAHH paid an entity called GA Marketing, run by Guadalupe Acosta, $7,700 per month to solicit doctors to refer patients to GAHH for home health services.

200.    GAHH knew that GA Marketing visited with doctors to speak to them about making referrals to GAHH. It also marketed GAHH's services to hospitals and provided pamphlets to advertise GAHH's services.

201.    GAHH knew that GA Marketing solicited home health referrals by paying for expensive meals and gifts.

202.    GAHH knew that it was indirectly paying for these meals and gifts.

203.    At first, the meals provided by GA Marketing were paid for directly by Ike and GAHH. Later, GA Marketing paid for the meals after negotiating an increased monthly fee with Ike and GAHH to cover the additional expense of the meals.

204.    When the meals were separately expensed to GAHH, doctor's office personnel took advantage of the arrangement by ordering excessive amounts of food. On one occasion, GAHH paid a doctor's office $5,900 for a single meal.

205.    A former employee of GAHH interviewed by the Government stated that he would deliver large gift baskets of wine as bribes to doctors to refer patients to GAHH for home health services. The same former employee also stated that he would purchase lunch on a regular basis for certain doctors' staff.

206.    On average, GAHH and/or GA Marketing on GAHH's behalf spent approximately $1,500 on each meal at a doctor's office.

207.    GAHH and GA Marketing knew their kickback scheme was working because they carefully tracked the effect of the remuneration paid to the doctors through the marketing efforts. GA Marketing provided a monthly report to GAHH showing which doctors it had marketed to that led to the largest increase in patient enrollment.

208.    As a result of these improper kickback payments, doctors referred patients to GAHH for home health services and the Defendants billed Medicare for these services.

## COUNT I
### Violation of the False Claims Act
### 31 U.S.C. § 3729(a)(1)

209.    The United States realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

210.    Defendants knowingly presented or caused to be presented materially false or fraudulent claims for payment or approval to Medicare Part A in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

211.    Specifically, Defendants knowingly made or presented, or caused to be made or presented, claims for payment for Medicare Part A home health services for ineligible beneficiaries.

212.    Defendants also knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim to Medicare Part A in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

213.    Specifically, Defendants knowingly made, used, or caused to be made or used, false statements about Medicare beneficiaries' eligibility to receive home health services in connection with claims submitted to Medicare Part A.

214.    Payment of the false or fraudulent Medicare Part A claims was a reasonable and foreseeable consequence of the Defendants' conduct.

215.    By reason of the foregoing, the United States has been damaged in an amount to be determined at trial.

216.    Defendants are liable to the United States for three times the damages sustained by the Government, plus a civil penalty of no less than $5,500 and no greater than $11,000 (as adjusted by the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015) for each false claim presented or caused to be presented and/or each false statement or record material to a false or fraudulent claim they made or caused to be made.

**COUNT II**
**Violation of the False Claims Act (Kickbacks)**
**31 U.S.C. § 3729(a)(1)**

217.    The United States realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

218.    Defendants knowingly presented or caused to be presented materially false or fraudulent claims for payment or approval to Medicare in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

219.    Specifically, Defendants knowingly made or presented, or caused to be made or presented, claims for payment for home health services that were tainted by illegal kickbacks made to induce referrals.

220.    Defendants also knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim to Medicare in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

221.    Specifically, Defendant knowingly made, used, or caused to be made or used, false statements about Defendants' compliance with the Anti-Kickback Statute in connection with claims for home health services.

222.    Payment of the false or fraudulent claims was a reasonable and foreseeable consequence of the Defendants' conduct.

223.    By reason of the foregoing, the United States has been damaged in an amount to be determined at trial.

224.    Defendants are liable to the United States for three times the damages sustained by the Government, plus a civil penalty of no less than $5,500 and no greater than $11,000 (as adjusted by the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015) for each false claim presented or caused to be presented and/or each false statement or record material to a false or fraudulent claim they made or caused to be made.

### COUNT III
### Payment By Mistake

225.    The United States realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

226.    The United States paid the Defendants based on a mistaken and erroneous understanding of material fact, namely, that the claims, records, and statements the Defendants presented and caused to be presented for payment were true, accurate, and eligible for payment.

227.    The United States, acting in reasonable reliance on the truthfulness and accuracy of the claims, records, and statements the Defendants presented and caused to be presented, paid the Defendants monies they were not entitled to receive.

228.    Defendants must account for and repay to the United States all funds paid to them by mistake, in an amount to be determined at trial.

### COUNT IV
### Unjust Enrichment

229.    The United States realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

230.    Defendants unlawfully obtained and benefited from Medicare payments they were not entitled to receive.

231.    Defendants would be unjustly enriched if they were permitted to retain the Medicare payments.

232.    Defendants must account for and disgorge to the United States all payments by which they have been unjustly enriched, in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff United States of America prays for judgment in its favor and against Defendants Margaret Ike and Del Norte Homecare LLC, also known as Del Norte Home Care LLC, doing business as Guardian Angel Home Health, as follows:

A.    On Count I (False Claims Act), three times the amount of the United States' damages in an amount to be proven at trial, together with maximum civil penalties allowed by law, costs, post-judgment interest, and any such other relief as the Court deems just and proper;

B.    On Count II (False Claims Act), three times the amount of the United States' damages in an amount to be proven at trial, together with maximum civil penalties allowed by law, costs, post-judgment interest, and any such other relief as the Court deems just and proper

C.    On Count III (Payment by Mistake), all funds paid to Defendants by mistake, in an amount to be determined at trial, together with costs, pre- and post-judgment interest, and any such other relief as the Court deems just and proper; and

D.    On Count IV (Unjust Enrichment), the amount by which Defendants were unjustly enriched, together with costs, pre- and post-judgment interest, and any such other relief as the Court deems just and proper.

Respectfully submitted,

JUSTIN R. SIMMONS
United States Attorney

*/s/ Thomas A. Parnham Jr.*
THOMAS A. PARNHAM JR.
Assistant United States Attorney
Texas State Bar No. 24146529
903 San Jacinto Blvd, Suite 334
Austin, Texas 78701
(512) 916-5858 (tel)
(512) 916-5854 (fax)
thomas.parnham@usdoj.gov

***Counsel for Plaintiff***
***United States of America***